UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Alene Gatti, ) | |
| o/b/o A. G-F., a minor ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 CV 50073 |
| ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Alene Gatti (the "mother"), on behalf of her minor daughter ("plaintiff"), brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits to plaintiff. For the reasons explained below, the decision is affirmed.

### BACKGROUND

Plaintiff was born on December 6, 2012. R. 19. The pregnancy was complicated due to the mother's increased blood pressure and medications she was taking for bipolar disorder and diabetes. After birth, plaintiff was placed in the intensive care unit because of feeding difficulties and remained there for 24 days. R. 259. Less than a year later, on October 25, 2013, the mother filed an application for supplemental security income on plaintiff's behalf. Since her birth, plaintiff has been seen by a number of treating doctors, as well as agency consultants.

Relevant to this appeal, in the fall of 2013, plaintiff's doctors at the Crusader Clinic referred her to Dr. Carl E. Stafstrom for a neurology consultation. He worked at the University of Wisconsin and saw plaintiff twice, once in September and November, and then submitted a report (Ex. 5F) upon which the ALJ relied heavily. Given this fact and also because the report provides a helpful summary, the Court will quote from it at length:

1

At the last visit, we suggested that [plaintiff] might benefit from physical therapy. However, mom states that [plaintiff] was evaluated 3 times by Birth to 3, and all 3 times [plaintiff] did not qualify for services. Mom has attempted to get Social Security for [plaintiff], but she has been denied. She is wondering if there is anything that we have to offer her to help get Social Security approved or what kind of therapies would be beneficial for [plaintiff].

Developmentally, [plaintiff] has made wonderful progress. She is crawling well. She can pull to stand, which she started doing around 10 months of age. She does occasionally cruise, holding on to furniture. She has not yet taken any steps on her own, though she will walk while holding onto someone's hands. She does reach for objects and continues to bring lots of objects to her mouth. She babbles frequently and grandpa states that he occasionally thinks she may be saying grandpa or bye. She appears to recognize faces and voices well.

Overall, [plaintiff] has been very healthy, without any significant illnesses. Mom is concerned that [plaintiff] may have asthma. [Plaintiff's] appetite is good and she continues to grow well and track along her growth curve. She has some constipation, which has improved with a stool softener. She also has intermittent abdominal pain. She is currently drinking whole milk and taking table foods. [Plaintiff] sleeps well at night, although there are some nights where she will wake 2-3 times per night. When she wakes up, she either wants to eat or just wants to be held. A complete review of systems was performed and is otherwise negative except as noted above.

*   *   *

ASSESSMENT AND RECOMMENDATIONS: [Plaintiff] is a beautiful and social 11-month-old girl with mildly decreased truncal tone and mildly increased lower extremity tone, consistent with a diagnosis of very mild cerebral palsy. She appears to be developing very nicely, and we think she will continue to reach milestones appropriately. However, we do believe she would benefit from physical therapy to help with her differences in tone. It would be reasonable for mom to attempt another evaluation by Birth to 3, to see if [plaintiff] qualifies for services, although we do feel as though [plaintiff] will likely do well even without physical therapy. Her head flailing and arm stiffening movements are not likely to be seizures. She has had a normal EEG and MRI in the past. The description of her movements seems very consistent with a mildly exaggerated startle response. We do not believe that [plaintiff] needs any further testing at this time; Grandpa agrees that [plaintiff] is an essentially normal child. The family will keep in touch with us, if any further concerns arise. No set followup was scheduled, but we would be happy to see [plaintiff] in followup, if new concerns arise.

R. 250-251.

On November 6, 2013, an agency doctor, Victoria Dow, issued a report. Ex. 4A. It does not appear that she examined plaintiff. Her report was prepared after plaintiff's first visit to Dr. Stafstrom but before the second visit. Dr. Dow found that plaintiff only had marked limitations in one domain, which was the sixth domain for health and physical well-being. Her conclusions seem to rest solely on notes from plaintiff's first visit to Dr. Stafstrom. Here is her analysis, which was set forth in two places and which seems to be mostly a regurgitation of Dr. Stafstrom's notes:

> **Analysis**
> U of W
> 9/20/13 Initial Pediatric Neurology Consult
> normal MRI of the brain; no developmental regression; rolled over at 7 months, sat up unassisted at 8 months and currently crawling; weight 13 lbs, less than 3rd%; cognitively bright and attentive; somewhat lower tone in trunk and truncal muscles
>
> impression: slight motor delays reflecti[v]e of low tone in the truncal muscles; slightly high tone in achilles tendons; overall excellent developmental progress
>
> \*   \*   \*
>
> **Family or General Practice:** 9/20/13 PN age 9 months, weight 6.21 kg in the less than 3% but not identified as being related to an additional, specific medically determinable impairment. No concerns noted, "looks well"[.]

R. 82, 84. Because she found plaintiff had "marked" limitations in only one of the six domains (two such findings are required to be found disabled), she concluded that plaintiff was not disabled. Plaintiff now relies heavily on Dr. Dow's finding regarding the sixth domain.

On December 10, 2013, a second state agency doctor, Julio Pardo, completed the same form. Ex. 4A. He reviewed the same evidence except that, because of the later date, he was able to review Dr. Stafstrom's final report. Unlike Dr. Dow, Dr. Pardo found that plaintiff had *less than* marked limitations in the sixth domain. His analysis consists of a summary of the two reports from Dr. Stafstrom and a summary of the notes from a few visits to the Crusader Clinic.

3

He did not explain why his conclusion regarding the sixth domain differed from Dr. Dow's from a month earlier. But the end result was the same—he too found plaintiff not disabled. R. 93.

On April 1, 2014, three therapists came to plaintiff's home (she was then 15 months old) and administered tests and then each prepared a detailed report. *See* Ex. 8F. The ALJ also relied heavily on these assessments. Although further details from these reports are described below, the gist is that plaintiff showed some significant delays in her fine motor skills and mild delays in gross motor skills, but that she was otherwise a happy and bright child who was functioning mostly in normal and age-appropriate ways.

On June 19, 2014, a hearing was held before an administrative law judge (ALJ). The mother was the only witness; the father remained outside the room taking care of plaintiff and did not testify. The mother initially identified three problems. The first was "some sensory issues with her hearing." R. 43.The second was plaintiff's balance—she was unsteady on her feet and had "fallen multiple times." *Id.* The third was stomach problems since birth. To these three, the mother then added a few more, including that plaintiff had a "horrible" sleep schedule and "does not really like being held a lot." R. 44-45.

The ALJ stated that she was most interested in plaintiff's recent condition, particularly the last six months. R. 47 ("I need to figure out where she's at nowish."). The ALJ and the mother then discussed various ailments, including plaintiff's recurrent ear infections (doctors advised waiting to see if tubes would be necessary); the fact that plaintiff had, according to the mother, a "ton of colds" (doctors told her that plaintiff "just [had] a cold or a little virus" and advised waiting to see if she could "fight it off"); sleeping problems (the mother sometimes had to put plaintiff in a car seat and take her for a ride to get her to sleep); constipation and diarrhea

4

(the ALJ suggested trying Mylanta which had worked for her own children).[1] 51-53. The ALJ noted that plaintiff had scans such as MRIs and asked whether they ever tested digestion specifically. The mother stated that doctors "found out [plaintiff] had questionable pyloric stenosis and acid reflux." R. 56. Plaintiff's counsel stated that plaintiff had been seen by Dr. Burress, a gastroenterologist, but the ALJ noted that this testing had been done a year ago and asked whether recent testing had been done. The mother said no. R. 57.

The ALJ next turned to the issue most relevant to this appeal—namely, whether plaintiff was "getting adequate nutrition or gaining weight properly." R. 58. The mother stated that doctors "were very concerned" at which point the ALJ observed that the record indicated that "she's caught up with herself and making steady gains the way she's supposed to." *Id.* The mother responded: "Right. But you said have they ever been concerned, and I said yes, they have been." *Id.* Discussion then ensued about plaintiff's rate of weight growth versus her low weight at birth. The ALJ offered this explanation:

> So, if [children are] like in the fifth percentile, but keep growing at the fifth percentile, that's normal. They're just a normal small kid. If they're at the fifth percentile and get up to the tenth percentile or whatever, they're thriving. If they're at the fifth percentile and don't keep growing, don't stay at that percentile and gradually grow for their age, in terms of height and weight, then there's a problem. So, having a small kid is not the same has having a malnourished kid or a kid who's not thriving.

R. 58-59.

The ALJ next asked about hearing problems. The mother stated that doctors had not indicated any specific issues but that she was just concerned and volunteered that she was "a disabled" person herself. R. 61. The ALJ explained how children fall into a range of normal values with regard to walking and other milestones. After acknowledging that plaintiff had some

---

[1] In offering this and other tips, the ALJ explained that, in addition to the evaluating the evidence, she was also "throwing out some thoughts that may help your life a little bit." R. 55. This Court's fair reading of the ALJ's comments is that she was not offering medical opinions, but suggestions that many people make to new parents.

5

"issues" and "delays," the ALJ expressed doubt about whether she had marked limitations in the sixth domain: "They [*i.e.* the doctors] haven't identified a failure to thrive, failure to grow problem. Lots of kids have lots of ear infections and lots of spitting up and whatnot, and they don't have marked deficits in health. They're still in the less than marked range, because of how frequent those problems are." R. 62-63, 66. At the end of the hearing, the ALJ stated that if she denied benefits now, the mother could apply for benefits again later, explaining that "it's sometimes hard to figure out what's going on" at 18 months old but that by age two and a half it would become clear whether plaintiff "is or isn't keeping up with other kids." R. 73.

On October 31, 2014, the ALJ issued her decision finding plaintiff not disabled. The ALJ found that plaintiff had marked limitations in the fourth domain (moving about and manipulating objects), but no marked limitations in any other domains. The ALJ gave the opinions of two state doctors (Dow and Pardo) "limited weight" because their conclusions were made before the later evaluations. The ALJ instead gave "great weight" to the evaluations of Dr. Stafstrom and the three therapists that showed that "despite her early and ongoing issues," plaintiff was "making appropriate progress." R. 21.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by

reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Federal courts cannot build this logical bridge on behalf of the ALJ. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

To determine whether an individual under the age of 18 is disabled, an ALJ applies a three-step sequential evaluation. 20 C.F.R. § 416.924(a). The ALJ must make the following inquiries: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"; and (3) whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing, or that functionally equals the listing. To functionally equal a listing, the impairment must cause a "marked" limitation in at least two of the six domains of functioning or an "extreme" limitation in one of them. 20 C.F.R. § 416.926a(b)(1)(i-vi).

Plaintiff only challenges the ALJ's finding that she had "less than marked" limitations in the sixth domain (health and physical well-being). Because the ALJ separately found that she had marked limitations in the fourth domain (moving about and manipulating objects), plaintiff would have been found disabled if she had marked limitations in the sixth domain.

7

Plaintiff raises two arguments related to this finding. The first, and the one given the most attention in her briefs, is that the ALJ lacked substantial evidence to reach this conclusion. Her second is that the ALJ erred in analyzing the mother's credibility.

The first argument is a collection of smaller arguments. Plaintiff first argues that the ALJ should have relied on the opinion of Dr. Dow. Related to this argument, plaintiff argues that the ALJ played doctor by concluding that, after her initial problems at birth, plaintiff was gaining weight appropriately for her age. Plaintiff interprets Dr. Dow's opinion as resting mostly on the fact that, at age 9 months, plaintiff's weight was in the 3rd percentile. Plaintiff also relies on a few observations from doctors that plaintiff was underweight. Finally, she has provided a chart of her Body Mass Index ("BMI") measurements at 17 data points. According to plaintiff, this chart shows that her weight was not stable or developing appropriately.

Before addressing these arguments, it is worth noting what plaintiff does *not* argue. In her two briefs, she never addresses the two key pieces of evidence relied on by the ALJ. As summarized above, after examining plaintiff twice, Dr. Stafstrom concluded that developmentally plaintiff had made "wonderful progress" and was "very healthy, without any significant illnesses." R. 250-51. It is true that he diagnosed her with "very mild" cerebral palsy, but he qualified this diagnosis by stating: "She appears to be developing very nicely, and we think she will continue to reach milestones appropriately." R. 251. In other words, he provided a medical opinion directly supporting the ALJ's conclusion. Plaintiff has not raised any arguments attacking the reliability of these conclusions, nor objected to Dr. Stafstrom's qualifications.

Similarly, plaintiff offers no rebuttal to, nor criticism of, the opinions of the therapists. Like Dr. Stafstrom, they observed plaintiff in person (in this case, in her home), performed tests, and issued detailed reports. Their assessments provide additional support. For example, Ms.

8

Bressler found that plaintiff was in the normal range in many areas, such as language and social skills, and noted that plaintiff's father stated that she was "doing very well." R. 258. In a separate report, Ms. Coffman concluded that plaintiff was "a very functional, bright little girl." R. 263. She noted plaintiff had problems with fine motor skills (specifically a 34% delay), but still concluded that even with these problems she was "close to her age range." *Id.* Finally, Ms. Butler found that plaintiff's language comprehension and expression were "age typical." R. 266. Aside from the problems with fine motor skills, which the ALJ accounted for by finding that plaintiff had marked limitations in the fourth domain, the therapists' assessments show that plaintiff was for the most part growing and developing in an age appropriate manner. By completely ignoring these opinions, as well as those of Dr. Stafstrom, plaintiff has made her argument an uphill climb. It is hard to prevail on the argument that an ALJ lacked substantial evidence without addressing the very evidence the ALJ claimed was substantial. ALJs cannot ignore whole lines of evidence. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). Likewise, plaintiffs cannot hope to prevail on appeal by ignoring huge swaths of substantial evidence supporting an ALJ's decision.

Even limiting the analysis to the evidence plaintiff chose to focus on, the Court finds that it is patchy and problematic in several respects. Plaintiff believes the ALJ should have accepted Dr. Dow's opinion. However, the ALJ explained that this opinion was rendered in the fall of 2013 when plaintiff was only nine months old and before additional evidence had been developed. This Court cannot find fault with this reasoning. Plaintiff has not offered any convincing reason why the ALJ should have credited Dr. Dow's opinion over that of Dr. Stafstrom, whose opinion was rendered later in time, was based on two in-person examinations, and which included a detailed report. In contrast, Dr. Dow provided no real analysis and she

9

relied exclusively on Dr. Stafstrom's observations. And it is not even clear *why* she found that plaintiff had marked limitations. Although she noted that plaintiff was then in the third percentile for weight, she acknowledged that Dr. Stafstrom had "not identified [this issue] as being related to an additional, specific medically determinable impairment" and that Dr. Stafstrom noted "no concerns" and found that plaintiff "looks well." R. 84. Moreover, it is telling that, although plaintiff was seen by a large number of doctors, both primary care physicians and specialists, it appears that none of them offered any bottom-line conclusions similar to that of Dr. Dow.

In addition to relying on Dr. Dow's opinion, plaintiff points to a few isolated observations from other doctors. In doing so, plaintiff engages in the same type of cherry picking that ALJs are prohibited from conducting. *See Tucker v. Colvin*, No. 14 CV 50021, 2015 U.S. Dist. LEXIS 149905, *20 (N.D. Ill. Nov. 4, 2015). Plaintiff relies mostly on one observation that she was "underweight." R. 376. This was contained in the doctor's note for a December 2013 visit she had with her gastroenterologist, Dr. Burress. But this isolated observation is much less than advertised. It is merely one word (with no accompanying analysis) listed under the heading "Reason for Visit," thus raising the possibility that it was not Dr. Burress's opinion but that of plaintiff's mother. This interpretation is supported by other statements in these same notes. Dr. Burress recorded that plaintiff's weight was in the 35th percentile (much higher than the 3rd percentile noted in Dr. Dow's opinion), and wrote that plaintiff was "[d]oing well" and had a "[g]ood appetite." R. 377. Further, under the "active problem list," Dr. Burress did not specifically refer to any problems about being underweight or not growing appropriately. R. 378. It is true that the ALJ did not specifically mention this one observation about plaintiff being underweight, but the ALJ did acknowledge that Dr. Burress had been treating plaintiff for

digestive problems and noted that neither he, nor any other treating doctor, had suggested that plaintiff was "not gaining weight properly or failing to thrive." R. 31.[2]

Plaintiff offers one other piece of evidence to support her first argument. This is a chart listing her BMI scores at 17 points from December 2012 through April 2014. Although plaintiff had an initial BMI score of 11.89, her scores quickly increased and then remained roughly in the 15 to 16 range. The chart was developed by taking some (although not all) of her BMI measurements from the notes of the various doctors who treated her. As explained below, this evidence at best provides ambiguous support for plaintiff.

To begin with, the conclusion plaintiff seeks to derive from the chart is fuzzy. It is not even clear it conflicts with the ALJ's reasoning. As plaintiff recognizes, her chart shows that her BMI scores "improved from birth," a point which supports the ALJ's conclusion that plaintiff had initial problems with low weight due to her 24-day hospital stay but that she eventually caught up and remained in a fairly stable range. Dkt. #11 at 5. Although plaintiff agrees that her own chart shows *some* improvement, she argues the BMI scores did not "increase dramatically over time." *Id*. The implication is that the ALJ found that the increase was "dramatic," but the Court can find no evidence for this assertion.

---

[2] Although not specifically listed in the ALJ's opinion, the record contains numerous statements from doctors indicating that, contrary to the mother's concerns, they believed plaintiff was growing appropriately. *See* R. 228 (12/31/12—Dr. Hofmeister: "1 month old female here for newborn exam, doing well, 1 lb above birth weight. Reassurance provided, meeting milestones."); R. 225 (2/6/13—Dr. Okeson: noting a small weight loss from last visit but nonetheless concluding that "weight gain has [been] good up until now" and patient "appears healthy, happy, well nourished, and well hydrated"); R. 220 (2/27/13—Dr. Hofmeister: "Advised mom that if she keeps changing [plaintiff's] formula around like this, she will continue to have problems. Some amount of spitting up is normal, and some babies do not have stools everyday. She is gaining weight and growing/developing appropriately at this point."); R. 218 (3/5/13—Dr. Okeson: "growth charts reviewed and were appropriate"); R. 216 (4/17/13—Dr. Hofmeister: "doing well today" and "reassurance provided to mom"); R. 209 (6/11/13—Dr. Hofmeister: "Growth appropriate today. Reassurance provided to mom, it is good she is vigilant, but she needs to stop obsessing and worrying so much. She is already established with various specialists (neuro, ped development, and GI at RMH). Cont to follow their diagnostic testing and plans. Although [plaintiff] may be a little developmentally delayed at this point, many kids catch up."); R. 202-203 (9/17/13—Dr. Hofmeister: plaintiff "tolerating solids without difficulty"; her "growth [was] appropriate"; and she was "[m]eeting the majority of her milestones").

Another murky issue is how the BMI scores should be interpreted and how they relate to the other metrics used by treating physicians, such as weight percentiles. It is important to remember that the BMI chart was created by plaintiff, not by any individual treating doctor or agency physician, and it was never shown in this form to the ALJ. Put more directly, no expert has ever relied on or evaluated this chart. In her briefs, plaintiff has not cited to any medical literature or case law to provide background information about BMI scores. Instead, plaintiff is apparently relying on her own interpretation of the data, thus raising the concern that she is doing what she faults the ALJ for doing: playing doctor. *See Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016) (courts, counsel, and ALJs must resist the temptation to play doctor). Although not entirely clear in her briefs, plaintiff seems to believe that a normal child's BMI scores should increase in a type of steady upward progression. But this point has not been fleshed out nor supported by expert testimony or authority.[3] Lacking such authority, the Court is not in a position to second-guess the ALJ's decision to rely on the opinions of Dr. Stafstrom and others who found that plaintiff was growing appropriately for her age. These doctors were aware of plaintiff's different weight measurements and percentiles when they reached their conclusions.[4]

Finally, the Court briefly addresses plaintiff's second argument, which is one paragraph in her opening brief. Plaintiff argues that the ALJ failed to analyze the credibility of her mother and should have credited her statements that plaintiff had stomach problems and "a hard time

---

[3] In fact, one CDC publication seems to indicate that BMI scores do not follow the type of straightforward linear path suggested by plaintiff: "BMI changes substantially with age. After about 1 year of age, BMI-for-age begins to decline and it continues falling during the preschool years until it reaches a minimum around 4 to 6 years of age. After 4 to 6 years of age, BMI-for-age begins a gradual increase through adolescence and most of adulthood." *Using the BMI-for-Age Growth Charts*, CDC publication, at p. 6, located at http://www.cdc.gov/nccdphp/dnpa/growthcharts/training/modules/module1/text/module1print.pdf. This publication also states that a BMI-for-age chart "is not used in the United States before 2 years of age to screen for growth," which raises yet another point of concern about plaintiff's heavy reliance on BMI scores. *Id.* at 3.

[4] *See* R. 251 (Dr. Stafstrom: plaintiff "continues to grow well and track along her growth curve"); R. 218 (Dr. Okeson: plaintiff's "growth charts [] were appropriate").

thriving." Dkt. #11 at 7. Plaintiff believes that these statements were supported by the reference in Dr. Burress's notes to plaintiff being "underweight" and by a test showing that plaintiff "potentially had pyloric stenosis." *Id.* However, this argument is largely a rehash of plaintiff's earlier arguments and fails for the same reasons. The Court has already discussed the "underweight" reference. As for pyloric stenosis, the report actually states that there was "questionable" and "mild" pyloric stenosis. R. 326. This is a vague statement, one that no other doctor accorded any significance to insofar as the Court can tell. There is no suggestion that plaintiff would have ongoing problems or required further treatment such as surgery. More broadly, the ALJ did not base her decision, at least in any significant way, on any credibility finding about the mother. As noted above, the ALJ summarized the mother's testimony and for the most part accepted her assertions that plaintiff had problems at times with vomiting, feeding, and related issues.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the ruling of the ALJ is affirmed.

Date: September 2, 2016        By: _____
                                   Iain D. Johnston
                                   United States Magistrate Judge